UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA

       v.

                                          MEMORANDUM & ORDER

                                          10-CR-657 (SJ) (RML)

LARON SPICER, et al.

              Defendants.

--------------------------------------------------X

A P P E A R A N C E S

UNITED STATES ATTORNEY
Loretta E. Lynch
United States Attorney
271 Cadman Plaza East
Brooklyn, New York 11201
By:    Matthew S. Amatruda
        Nadia Shihata
*Attorneys for Plaintiff*

LAW OFFICE OF FRANK HANDELMAN
325 Broadway, Suite 201
New York, NY 10007
By:    Frank Handelman
*Attorney for Defendant Laron Spicer*

LAW OFFICE OF JOYCE LONDON
20 Vesey Street, Suite 400
New York, NY 10007
By:    Joyce C. London
*Attorney for Defendant James Dowtin*

MICHAEL S. HUGHES
P.O. Box 39
119 Pondfield Rd.
Bronxville, NY 10708
By:     Michael S. Hughes
*Attorney for Defendant Robert Montemoino*

HURWITZ STAMPUR & ROTH
299 Broadway, Suite 800
New York, NY 10007
By:     William J. Stampur
*Attorney for Defendant Jamar Williams*

**JOHNSON, Senior District Judge.**

On March 9, 2012, a grand jury in the Eastern District of New York handed down a superseding indictment charging defendants Laron Spicer ("Spicer"), James Dowtin ("Dowtin"), Robert Montemoino ("Montemoino") and Jamar Williams ("Williams", collectively the "Defendants")[1] with gang-related crimes stemming from their alleged membership in the Nine-Trey Gangsters ("NTG"), a subset of the Bloods street gang, which operated between approximately 1994 and 2010 in the Crown Heights neighborhood of Brooklyn, New York. Specifically, the Defendants have been charged under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §§ 1961-1968, with being members of an enterprise that engaged

---

[1] Also charged in the same indictment are the remaining defendants in this case, namely, Tyquan Rogers, Dwayne Monroe and Rashawn Sharp. These defendants will be tried in a separate trial at a later date and are not subject to the instant order (See Dkt. No. 294.).

2

in narcotics trafficking, acts of violence, murder, attempted murder, assault and firearms violations.[2]

Before the Court is the government's motion for an anonymous and partially-sequestered jury. Based on the submissions of the parties and for the reasons stated below, the government's motion is GRANTED in part and DENIED in part.

## DISCUSSION

The Second Circuit has explained that empaneling an anonymous jury "may be warranted when the jury needs protection, as when the government has demonstrated defendant's willingness to tamper with the judicial process, or when there has been extensive pretrial publicity in cases involving allegations of violent conduct." United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994) (internal quotation marks, citations and alterations omitted). In reviewing a challenge to the use of an anonymous jury, a court must "balance the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." United States v. Prado, No. 10-CR-74 (JFB), 2011 WL 3472509, at *2 (E.D.N.Y. Aug. 5, 2011). Accordingly, "[a]s a general rule, a district court may order the empaneling of an anonymous jury upon '(a) concluding

---
[2] The parties' familiarity with the facts and charges alleged in the indictment (Dkt. No. 237) is assumed. The facts alleged in the indictment and the government's motion *in limine* filed on March 14, 2013 (Dkt. No. 299), are incorporated herein.

that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" United States v. Stewart, 590 F.3d 93, 124 (2d Cir. 2009) (quoting United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991)).

"[W]hen genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." United States v. Quinones, 511 F.3d 289, 295 (2d Cir. 2007) (citation omitted). The same is true for partially sequestered juries. See United States v. Gotti, 459 F.3d 296, 345-46 (2d Cir. 2006) (applying the same standard to the defendant's challenge to the use of an anonymous jury as to a partially sequestered jury).

I. Need to Protect the Jury

To determine whether there is a "strong reason" to believe that the jury needs protection, the court examines the following four factors: (1) whether there is "a 'demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf,'" United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012) (quoting United States v. Vario, 943 F.2d 236, 241 (2d Cir. 1991)); (2) "the seriousness of the crime," Quinones, 511 F.3d at 296; (3) the likelihood of pre-trial publicity, id.; see also Vario, 943 F.2d at 240 (explaining that "[p]re-trial publicity may militate in favor of an anonymous jury because it can 'enhance the possibility that

jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public,'" (citation omitted); and (4) whether the defendant has access to means of harming the jury, see United States v. Melendez, 743 F. Supp. 134, 137 (E.D.N.Y. 1990).

The Court concludes that the government has sufficiently met its burden in establishing that the jury in this case needs protection. First, two of the defendants that are subject to the government's motion, namely Spicer and Dowtin, have a demonstrable history of obstructing justice both in other proceedings and the instant proceeding. The alleged leader of the Nine-Trey Gangsters, Spicer, has a prior conviction for witness tampering. (See Govt.'s Reply in Support of Mot. in Limine for an Anonymous and Partially Sequestered Jury (Dkt. No. 322-1).) Spicer's prior conviction is especially serious since the witness at issue was a member of law enforcement. (See Dkt. No. 300 at 10.) Obstruction of justice "has always been a crucial factor in our decisions regarding anonymous juries." Vario, 943 F.2d at 240 (citing United States v. Tutino, 883 F.2d 1125, 1132-33 (2d Cir. 1989) (history of jury tampering attempt when coupled with defendant's serious criminal records, was sufficient to justify the empaneling of an anonymous jury)); United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985) (justifying anonymous jury because of "strong evidence of defendants' past attempts to interfere with the judicial process, and [because] defendants were alleged to be part of a group that possessed the means to harm jurors").

Similarly, Spicer's brother, Dowtin, has both shown a willingness to engage in witness tampering prior to his pre-trial incarceration and while incarcerated at the Metropolitan Detention Center. (See Dkt. No. 300 at 9-11.) Specifically, the government alleges that while Spicer was awaiting trial on another matter in 2008 and 2009, Dowtin allegedly "talk[ed] to" the victim regarding the case that was pending against Mr. Spicer at the time. (Id. at 10.) Also, the government alleges that Dowtin "sent threats to another witness who is currently in custody" in an effort to allegedly "dissuade" the individual from cooperating with the government. (Id. at 11.) Spicer's prior conviction for witness tampering and the government's allegations of Dowtin's conduct collectively establish that Defendants have "a demonstrable history or likelihood of obstruction of justice." Pica, 692 F.3d at 88 (internal citations and quotations omitted).

Second, there is no question that the "seriousness of the crime" charged, which includes, inter alia, one count of murder and four counts of attempted murder, warrants protection of the jury. As stated previously in this district, these types of charges alone warrant an anonymous jury because they "are of the utmost seriousness, indeed as serious as any charge can be, and demonstrate both the extreme dangerousness of the defendant and willingness to obstruct justice." United States v. Wilson, 493 F. Supp. 2d 397, 399 (E.D.N.Y. 2006) (capital murder case involving a member of the Bloods gang). However, in addition to the charges of murder and attempted murder, the indictment alleges that the Defendants are part of a criminal

enterprise known as the "Nine-Trey Gangsters," a set of the Bloods street gang, who controlled with violence nearly all of the organized illegal activity for a decade on Sterling Place in the Crown Heights neighborhood of Brooklyn. In short, the Defendants' violent criminal history and their alleged participation in a large scale criminal enterprise without question exhibits their dangerousness, satisfying the first two factors.

The third and fourth factors are also met since there has been media attention in this case, which it is expected to attract throughout the trial, and, as discussed, Defendants have exhibited a capability of obstructing justice. As such, the Court concludes that the government has met its burden in establishing that the jury in this case needs protection.

II. Reasonable Precautions

Second, once the Court determines that the jury needs protection, which in this case it has, the Court must ensure that "reasonable precaution[s] must be taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants." Thomas, 757 F.2d at 1365. As such, the Court alone will conduct the *voir dire* and, in doing so, will provide the veniremen with neutral, plausible explanations for the security measures, such as their right to privacy and the potential for media attention. In taking these steps, any prejudicial effect on the jury will be minimized, thereby protecting the Defendants' constitutional rights.

III. Considerations of Judicial Economy

In deciding the instant motion, the Court must also be mindful of today's economic climate. Because of the toxic atmosphere on Capitol Hill, Congress and the Administration have been unable or unwilling to produce a budget. As a result, on March 1, 2013, sequestration went into effect. Sequestration to some means mandatory budget cuts. Sequestration to the Judiciary means more. It means unrelenting, unforgiving pain.

On August 13, 2013, the Chief Judges of 87 federal district courts wrote to Vice President Joseph R. Biden to inform him of the devastating impact the sequestration cuts are having on the Judiciary. See Letter to the Honorable Joseph R. Biden, President of the U.S. Senate, dated August 13, 2013 (the "Letter to Vice President Biden").[3] The Judiciary, a co-equal branch of the government, receives $7 billion annually for its operations. This represents less than 0.02% of the total federal budget.[4] When the United States prosecuted the war in Iraq, we spent $720 million a

---

[3] See Letter to Vice President Biden, available at http://news.uscourts.gov/sites/default/files/Chief-Judges-Letter-to-Joseph-Biden.pdf (last visited September 18, 2013).

[4] "Congress approves the federal courts' budget and appropriates money for the judiciary to operate. The judiciary's budget is a very small part – substantially less than one percent – of the entire federal budget." (Federal Courts in American Government, United States Courts available at http://www.uscourts.gov/FederalCourts/UnderstandingtheFederalCourts/FederalCourtsInAmericanGovernment.aspx (last visited September 18, 2013)).

8

day.[5] The war in Iraq has cost the United States more in 10 days than we spend in an entire year to fund the third branch of government.

Sequestration has mandated furloughs and eliminated positions. It has curtailed the ability of courts nationwide to provide services mandated by law. As such, the safety of the community and court staff is jeopardized.[6] Funds for courthouse security have been reduced 30% nationally. The budget for Federal Defenders has been cut 20%, causing staff members to take – on short notice – 20 unpaid furlough days from April to September 2013. Payments to CJA attorneys were slashed more than 10% and as of September 17, 2013, these reduced payments have been suspended.[7]

The cost of sequestering a jury is not insubstantial. In two recent single-defendant cases in this courthouse, United States v. Basciano, 05-cr-60 (NGG), and United States v. Wilson, 04-cr-1016 (NGG), each trial cost the Judiciary between $3 and $4 million. In Wilson, 4,000 subpoenas were served to prospective jurors.

---

[5] Kari Lydersen, War Costing $720 Million Each Day, Group Says, The Washington Post, Sept. 22, 2007, available at http://www.washingtonpost.com/wp-dyn/content/article/2007/09/21/AR2007092102074.html (last visited September 18, 2013).

[6] "This past year alone, there were forty-two threats made against judges and court officials in the Eastern District of New York, including a plot to assassinate Joseph F. Bianco, a district judge in Central Islip, New York." See "Report on the Continuing Effect of Judicial Budget Cuts on The U.S. District Courts for the Southern and Eastern Districts of New York," prepared by the Task Force on Judicial Budget Cuts, New York County Lawyers' Association, September 4, 2013, at p. 29, available at http://www.nycla.org/siteFiles/Publications/Publications1637_0.pdf (last visited September 18, 2013).

[7] See Memorandum to All United States Judges from Jude John D. Bates regarding "Temporary Suspension of Criminal Justice Act Panel Attorney Payments", dated September 16, 2013.

Questionnaires were prepared for the veniremen and had to be reproduced over 4,000 times. Security personnel had to be hired. Vans to transport the jurors to and from the courthouse were rented and sustenance had to be provided to the jurors. Each day a juror attended court they were compensated at $40 a day.

As Judge Julia S. Gibbons, Chair of the Budget Committee of the Judicial Conference, so aptly stated before a Senate subcommittee: "Our workload does not go away because of budget shortfalls."[8] For most, sequestration has forced cuts "to the bone." For the Judiciary, sequestration has forced cuts "to the marrow."

## **CONCLUSION**

Procedures, such as partial sequestration of jurors, have fallen victim to the devastating mandatory cuts. Accordingly, the government's motion for an anonymous jury is GRANTED and its motion to partially-sequester the jury is DENIED.

SO ORDERED.

DATED: September 18, 2013 _____s/_____
       Brooklyn, New York        Sterling Johnson, Jr, U.S.D.J.

---

[8] Testimony of the Honorable Julia S. Gibbons, Chair of the Budget Committee of the Judicial Conference of the United States, before the Senate Judiciary Subcommittee on Bankruptcy and the Courts at a hearing entitled "Sequestering Justice: How the Budget Crisis is Undermining our Courts," July 23, 2013, available at http://news.uscourts.gov/funding-crisis-strikes-throughout-federal-courts-judge-tells-senate-panel (last visited September 18, 2013).